Good afternoon again, Your Honors. May it please the Court, my name is Marjorie Barrios, and I represent plaintiffs' appellants Newberry et al. in this matter. I would like to reserve three minutes for rebuttal, please. As the Court knows, the central question before this Court is whether plaintiffs are entitled to a trial in this case, given that there are several disputed issues of material fact that must be evaluated by a jury. The answer to that question must be yes. The several issues that the lower court viewed in a light most favorable to the movements instead of the other way around, and I'll begin with that, is the plaintiff's assertions that this was a criminal search under the guise of an inspection warrant. I'm sorry? The first fact that I believe was in dispute was that this was a criminal search under the guise of an inspection warrant. I mean, my overall reaction to this case is that what happened here seems to have real problems, but how it's connected to your clients and these defendants is the problem. So that's what I'd like to know. Okay, Your Honor. May I just add that part of that problem arises because this seems like it was, I'll call it, a city-sponsored event, but obviously the city defendants are absent because of their bankruptcy, right? So there are a lot of gaps here, it seems to me. Yes, Your Honor. So I'll address both questions. The first one is that it was a city-sponsored event, but it had the participation of the county agents in this matter. But these people, it does not appear. The defendants you have are the county and two probation officers and one child protective service person, is that right? Yes. Okay. And you don't have any evidence of any direct connection between any of those individuals and any of your plaintiffs, is that right? Well, Your Honor, our assertions are that those are what may be viewed as credible or not credible by a jury. They, in their, I would call it self-serving declarations, said, oh, yes, we both just looked at two apartments and our recorder spelled simultaneously. Those were, both of the probation officers' declarations were mimetic. And then, but those are questions, those are things that can be viewed by a jury as not credible. Well, what's the contrary evidence? So did any of your clients say, oh, yes, it was those people? My clients did not say directly those were those people, but they said we remember seeing probation officers. But six of my clients were the ones that were taken identification from by probation officer Moreno, who was a defendant in this matter. So there is a connection between six of the plaintiffs and probation officer Moreno. Additionally, Your Honor, there was direct testimony from Lieutenant Lockett saying that probation was there to look for probationers, that to see if they were in compliance with their probation. What is a probation officer doing at an inspection warrant looking for probationers? That's why we believe that it was a joint effort, not just, you know, it was the ball was put in rolling by the city, but it was in connection with county probation. So is what you're saying that the warrant should be tested not under the administrative search doctrine, but under the regular standard probable cause? Exactly, Your Honor, because there are many material facts in dispute that point to the warrant being a criminal warrant. So, again, first, Lieutenant Lockett testifying that probation was there to look for probation for probation violators. Additionally, probation and child protective services serving a warrant that is an inspection warrant, but yet it was a no-notice warrant. It was a forcible entry warrant. No notice was ever sought. I'm sorry, no consent was ever sought from the tenants and probation officers. Isn't there a better argument, therefore, that if it's to the degree it's an administrative warrant, those provisions aren't justified? Yes, we also argue that it was a facially invalid warrant, Your Honor. And, Your Honor, there is another issue that Lieutenant Lockett said that the reason to aspirate identification from the tenants was so that they can conduct an investigation and run warrant checks on them. What administrative warrant would dictate that it's acceptable to run warrant checks on tenants who had leaky pipes? And, like I said, that list that Probation Officer Brown compiled, six of those people were our plaintiffs. So, I mean, I guess I have the same general overall sense that there's a problem here, but I'm just trying to put my finger on exactly what the harm was. So what's wrong? I mean, is it a Fourth Amendment injury to take somebody's name? I mean, there's no contention that they then ran it and then got arrested, right? That didn't happen. You know that. There is no contention, Your Honor, but we're arguing what was the motive for taking down their name. Once they had their name and their identification number, and in some of the cases in this matter. No, no, but you didn't answer. His question is, is it a violation of something to take their name down? We're not alleging that it was a violation, Your Honor, to take their name down. We're alleging that it was a Fourth Amendment violation, the intrusion, the illegal entry, the. . . Well, lots of those names were taken in the yard, right? Or in the, you know, outside the apartment. So if the illegal entry is the Fourth Amendment intrusion, did any of these three defendants do that with respect to your clients? Yes. Were their names taken? We have a list. Yes, your clients. Yes, our clients' names were taken. On that list from Brown? Yes. I thought those names were taken outside the apartment. After they had been told to go outside by probation and city. Well, whoever told them to go outside, but still, it was outside the apartment. So what's the intrusion? The thing is the preface to that, Your Honor. They were obliged to go outside by the police department and the probation officers. Okay, so my question, though, is did any of these, the three defendants, the two probation officers and the child protection officer, did any of them go into your clients' apartments physically? Did any of those three people go into your clients' apartments inside? No, there's no direct testimony as to that right now. Okay. Well, then what did you mean when you said that the picture was taken by Moreno? That was inside an apartment, wasn't it? Yes, a picture of the tenant's apartment. Yes. We're not saying that that picture specifically was taken by Moreno. That's what you said earlier. I'm sorry, Your Honor. You said that very specifically. You said the picture was taken by Moreno. Now you're saying it wasn't. No, the identification was taken by Brown, by Officer Brown. All right. Well, that's not what you said. I apologize, Your Honor, if I incorrectly said that. The picture identification were taken and the names. You mean taken, meaning looked at. He wrote them down. Right. He wrote down their identification numbers in that list. Okay. So there's no evidence that any of these people, any of the defendants were inside any of your clients' apartments? There is no direct evidence. So that's why the whole thing becomes so murky, because let's say it was invalid to have a no-notice administrative warrant, which I'm somewhat inclined to think it was, all right, meaning that they can go into somebody's apartment without notice, but they didn't go into any of your clients' apartments. So what do we do with that? We're saying that they were integral participants in the whole suite, in the whole raid, Your Honor. They were integral participants. But they didn't go to anybody. Does he mean somebody else went into your clients' apartments? Did somebody go into your clients' apartments? Yes, absolutely. All of my clients, someone, either someone in the police or probation, went into their apartments and told them to get out of their apartment while code enforcement and the police. And we have two from your actual clients, I think we have what, how many declarations do we have? I believe we submitted just two, Your Honor. Right. And one of them said, county probation officers and child protective service workers entered my home and searched it, but you seem to have abandoned that contention. The reason for that is that my clients, some of them had just come home from a graveyard shift and they were taken out of their apartments by either code enforcement and San Bernardino Police Department or probation. Some of my clients were unable to immediately look to see whether the back of their vest said San Bernardino Police or probation. But although that's in a declaration, you're not standing on that at this point. We're not. All right. And the other person says that numerous people entered my home and photographed and videotaped the interior. Yes, that is correct. Okay. So who all, so what's it, 35, 36 unit building, something like that. Let's say you have a client named Jones. Jones lives in Apartment 3. Who all is an integral participant in the search of Apartment 3? Is it just the people who stand in, who stand outside Apartment 3 when the others are going in? Or is it everybody who searches any unit in the whole building? It's whoever enters, whoever participates in the raid, Your Honor. So it's anybody who's involved in the raid, even if they don't go anywhere near Apartment 3? Yes, we're saying that because. Is there any case from the circuit that supports that? Because I think there's one that actually goes the other way. Yes, absolutely there is, Your Honor. And we're talking about Boyd. And Boyd, even though one of the officers did not enter the apartment unit, because he was considered an integral participant, because he was part of the operation, he knew that flash bang grenades were going to be deployed and did not object to it. He was standing outside the door, wasn't he? Correct. And he was still held as an integral participant. I'm talking about somebody who's at the other end of the apartment complex going into another unit. They would still be integral participants, Your Honor, because these three people, Brown, Moreno, and Passini, they all attended the briefing. They all received an operations packet. So anybody who's involved is an integral participant in each and every search that happens. So are you familiar with Hopkins v. Bonvincino? I believe I have. I did review it, Your Honor. It's just eluding me. So that says that there's a talks about while the integrant participant rule may extend liability beyond those who provide an armed backup, it's clear that an officer who waits in the front yard interviewing a witness and does not participate in the unconstitutional search in any fashion can't be held liable. So that suggests that there's a line somewhere. In other words, the ones that are involved in some way in the actual search of the particular unit might be integral participants, but others aren't. Your Honor, and, yes, I see how that case might apply. However, in this case, even though they didn't say that Moreno and Brown didn't go inside each apartment, Moreno knew about the illegality of the search, and she still went anyways. Well, how did she know about the illegality of the search? First, she's been on three previous searches, Your Honor, and in 2013 she received an email that said, we're looking for targets. They said targets to search. And then two weeks before this warrant was applied for, she received an email that said, we're looking for your participation. Well, look, let's suppose, suppose this warrant did not have the no entry, the no notice forcible entry provision. And just the warrant itself, we don't have any evidence, do we, that these three people even saw the affidavits? That's correct. All right. So the warrant itself on its face, if it didn't have, I mean, I'm very troubled by a no entry execution of an administrative warrant. That seems somewhat contrary to the whole notion. But suppose it weren't in there. It was just a search, just an administrative search for building code. But, you know, as often is the case, if you take pretextual traffic stops, for example, they were going to look around while they were there. But that wasn't, so you're saying that's invalid. If they say, we're going to do an administrative search, we're going to follow the rules for an administrative search, we're not going to go do anything beyond what we could do for an administrative search. But if we happen to pawn somebody that we know is wanted for a crime, we're going to arrest them. Is that a problem? Yes, Your Honor. It is a problem. Because if the motive of the search is to discover criminal evidence, then it needs to be a criminal search warrant, not an administrative search warrant. I mean, your case is a lot stronger than that, actually. Because they did have a no-notice requirement, and they barred the exits for some reason. And they were looking for, quote, unauthorized people. And they seemed to be doing a lot of things other than enforcing an administrative warrant. But if they just stuck to the ‑‑ if they had just an administrative warrant, but they knew there was some criminal stuff they hoped they'd fall over, why is that a problem? What case says it's a problem? Alexander, Your Honor. Alexander specifically says that the court concluded that an inspection warrant was not a substitute for an arrest warrant. And then it says that if, in fact, the officer's primary purpose in storming the house was to arrest Quaid rather than to assist the health officials in executing the inspection warrant, then Quaid's Fourth Amendment rights were violated. All right. And it was primary purpose and so on. In this case, Your Honor, Officer Brown's declaration says that he took the identification because he adopted the goals of the search, which was to take identification to identify suspects or witnesses to the crime that the city was looking for. And then the operations packet that they were given, it says, we shall identify any and all illegal activity that may identify ‑‑ Have you ‑‑ what remedies are you seeking here? A trial, Your Honor. Remand. I'm sorry? Remand. No, but I mean in the case as a whole. We had asked for an injunction. Against whom? Against the city and the county, so that this practice is stopped. The county cooperated. But the city's out, so the county. Yes, the county cooperated. Are you pursuing that? Yes. Was it ruled on separately? And the county at one ‑‑ I'm sorry, are you talking about the city, Your Honor? No, the county. The county. About the injunction? Yes. No, we have not pursued that. We were denied the injunction. We did seek an injunction at the beginning and we were denied the injunction. Okay. All right. Well, your time's up, but we'll give you some time. Yes, thank you, Your Honor. Good afternoon. May it please the Court. I am Matthew Marnell, Deputy County Counsel for all appellees, including the county and the two probation officers and the human services officer. I would like to start, as was done with the reply, to point out that I challenge the Court and the appellee to show where that evidence was presented to the trial judge that six plaintiffs had their IDs taken. Six plaintiffs what? Six plaintiffs had their IDs taken. There was no correlation in the record between the unconstitutional conduct and these individual plaintiffs, and that is what the trial judge dealt with in his decision. So are you saying that nobody's IDs got taken? No, absolutely IDs got taken. But the plaintiff, in opposing summary judgment, there was an attempt at a class action to try and tie it all together. That was denied, so we're left with these individual plaintiffs. And there was no correlation made in the opposition between any one of these plaintiffs suffering those constitutional deprivations. If you're going to take that taking an ID is a constitutional deprivation, there wasn't even a record of that. Okay. Okay? Well, who are the current plaintiffs? Is Jonathan Paluto one of them? Yes. Well, his name is on the list that Brown took the ID from. Okay. So as to that particular ---- Oh, you're wrong. Yes, I apologize, Ron. You are correct in that regard. As to Paluto, he did take an identification. But as you pointed out, that in itself ---- There's somebody else. Well, that may be ---- I mean, that's just off the top of my head, but I haven't ---- Okay. You're right. One by one count. It's in Paluto's affidavit, too. Yes. All right. Then you have to look at the ---- As to this overall characterization, I would point out that there's much more to the history than was stated in the reply. The reply is attempting to narrow the focus of this to a code enforcement officer looking at four units. If you look at the declaration or the deposition, this letter and our statement of undisputed facts, you will find, in fact, she walked in with an entire box of a multiyear history of violations in these apartments. I mean, that's fine. And I don't doubt that there was a basis for getting an administrative warrant to look for code violations. As to all the apartments. Let's assume that for now. As to the units. Why does that lead to a no-notice requirement? Why does it lead to closing the exits of the place so people can't leave? Why does it lead to looking for, quote, unauthorized people and identifying everybody on the premises and keeping lists of everybody on the premises? How is any of that connected to a code violation warrant? Some of this is in the warrant, and others were things they did when they got there. Yes, Your Honor. You've stated multiple things. One of them is why do you have to take witnesses? They're going after a landlord who has had multiyear violations. You have to identify who the victims are, who the potential witnesses are, along with the violations that are in that apartment. And why do you have to not let them leave if they want to leave? I do not know that the probation officers were at all aware. Well, I'm looking at the whole system. And they were told that that was what was going to happen. The exits were going to be closed. They were going to secure the facility and nobody was going to be allowed to leave. I would mostly say they'd be concerned with who can enter. I'm sorry, what? Who can enter. Well, that's not what they said. They said that they're not letting anybody leave. That was my understanding. And what about why do you have no notice? Why don't you – Exactly. Well, Your Honor, if you give any deference to the trial court judge who issued this warrant, he allowed for no notice. I know. What? It was in the warrant. And I can give you an explanation. But the officer stated that he had said they were looking for a murder person, a murder witness. No, Your Honor. They said there was a history of crime, not that they were looking for a murder. And that there was a murder. And that there had been a murder. There was a murder. There's a history of this. Ergo, the importance of security during this code enforcement search. Security, having a sufficient number of officers to protect the totally unarmed inspectors. All right. And therefore, we're going to barge into people's houses. I mean, these are the tenants who are essentially the victims. That's exactly correct, Your Honor. And you're going to go barging into their houses without asking for consent, without giving them any notice, and without, you know, knocking down the doors if they want to. Well, again, Your Honor, you have to take considerations of security. Again, if you're going to announce ahead of time that you're all coming in, you are raising the prospect of resistance, both coordinated and individual. Well, but this is an instance where supposedly you're helping the people there, not hurting them. So what do you do? But unfortunately, in the history of code enforcement, there is resistance, sometimes coordinated. And I know it's outside the record, but I was the code enforcement prosecutor for the county for six years. And the very first case I was introduced to, 30 people locked arms in front of the police officers singing, I shall overcome. Yeah, and therefore. That is why you have to be worried about security. Therefore, you can go barging into their houses. Pardon me? And therefore, you can go barging into their houses. I didn't hear you. Barging into their houses. Yes. Okay. Exactly. And let's look at the individual facts of this case. You're talking about vast infestation of insects and pipelines. And please note, it wasn't illegal connections of pipelines. It was entire illegal pipelines. How are you going to search for all the illegalities of an illegal pipeline unless you look in each individual pipeline? Knock on the door and say, I think your landlord has been doing a lot of bad stuff, and I'd like to look. So let me ask you a question about this no-notice thing for a second. So the statute under which this was done typically requires advance notice, right? And that's what the judge said that they didn't have to do. That is correct. Is there a distinction between a no-notice administrative warrant and what you would call a no-knock warrant? Are those the same thing or are those different things? Was this a no-knock warrant? So a no-knock warrant would be one where they don't have to knock on the door. They can just go right in. I would have to concede that clearly this was you didn't have to give the 48 hours advance notice. That's not what I'm asking. I'm asking if you had to give the 48 seconds of the knock on the door. It did knock. So this was not a no-knock warrant? Correct. And they did, by everything in the record. Is there any evidence in the record that suggests that they forced their way into any apartment without first knocking? Not one iota. So no-knock and no-notice aren't the same thing? That is correct. Because the California statute requires 48 hours. And again, to relate the no-notice, Your Honor, I would also suggest that this was also qualified immunity granting and there is a Ninth Circuit court decision cited in my brief which already said that the notice provision does not rise to a constitutional violation. And therefore, even if these probation officers were thoroughly aware of the Ninth Circuit cases, they would have no reason to know that the fact that this is a no-notice warrant is a violation of constitutional law and therefore they would still be entitled to qualified immunity. Well, the main administrative warrant cases all stress the fact that there was notice, that there was notice, the main administrative warrant cases. But again, there's a Ninth Circuit court case saying that it does not rise to a constitutional violation not to have notice. What case is that? I'm sorry, Your Honor, I cannot put with the brief time provided. Is it in your brief? Yes, it is, Your Honor. Okay. It's definitely within my brief. And therefore, they would have qualified immunity anyway with the — and by the way, Your Honor, I think there's a lot of authority. I would respectfully suggest as to code enforcement administrative warrants, there's not a lot of authority. There's not a lot of guidance. And the reason why code enforcement is peculiar is because of these things like gas lines and where the, as you say, the victims of the landlord's actions are the persons whose household has to be searched and it inherently creates that problem. They have to be searched. It's not like a business operating illegally where they go in and they inspect and the person who is the subject of the inspection is the suspect. So you have to deal with these concepts of security and how you're going to enter into the homes and what is allowed, peculiarly under the circumstances where you're dealing with the victims. Also, Your Honor, I would emphasize that any questioning by Officer Brown was done in an all-within-the-confines of the detention already performed by the city. There is not one iota of evidence that any one of the county people ordered the people out of their homes. That was done by the city officers. And all he did was ask for their names and identification and whether anyone was on probation aside during the time of that detention. You want to address the Monell liability issue for a minute? Well, Your Honor, I'm not aware of any evidence that this was the product of a custom policy and practice of the county of San Bernardino. It was just custom and practice or also training? That there was any error in training. Well, I mean, is that the allegation, a lack of proper training? Is that one of the allegations? It could be, yes, Your Honor. But there's no evidence of a lack of training. It was not addressed. One of the individual defendants said that this was, I think, the third such joint project that she participated in, an inspection of this kind. So what is it that's not the – I mean, I presume if she was doing that, it was because she was doing it pursuant to policy. She did say she got permission from her supervisor and so on. As shown in the record. So what is it that's not the policy, this kind of a warrant or barring the exits or what exactly? Well, as in the record, there's a cooperation agreement between the public entities. Right. And they were just providing security. Right. But what – How is that a problem? I mean, I guess the question is, is there an inference that this kind of a search or sweep was – had happened at least twice before because this one woman had gone on three of them, she said? And with no evidence of any unconstitutional actions on either of them. Well, that's a different question. Whether there's a policy to do whatever it was that was done here. The policy was to cooperate with the entities who asked for security. This is exactly what was provided – only provided. And the human resources officer who was there to provide information. And admittedly, should one of the police officers identify a problem – Well, if you wanted to have security, if you're the city of San Bernardino and you want to have security, why would you ask some probation officers to come provide the security? Manpower. Additional manpower needed, limited resources to the city, which is now in bankruptcy. But they said they were looking for probationers. No, they didn't. I'm sorry, Your Honor. Well, I thought they did say that. An email by one employee a year before said we're looking for TARPs. And Ground didn't say that he was going to look for probationers while he was there? No. He asked if anyone inside the apartment was a probationer, again, as a function of the security. As Lieutenant Lawhead directed them, and as Lieutenant Lawhead said, we recognize that probationers and parolees, when on site, have the propensity to perhaps be more resistant than other people. It's the same thing. It's watching out. That's why they only went in the apartments and looked. There's no indication here they opened up doors or they opened up closets looking for people. All they did was go in and make sure everyone was out of the apartment. And he asked if there are probation and parolees in case the event that there may be people more resistant to these searches than other people. But it never became a problem. There's no evidence that it ever became a complication throughout the search. I believe. Well, if you have any more questions, Your Honor. I don't. Thank you. And I would again emphasize that there aren't a lot of Ninth Circuit Court decisions on code enforcement. I was talking about Ninth Circuit. I was talking about the Supreme Court. In general, the administrative warrants do stress the fact that there was notice. Barlow's camera, James v. Wyman, and so on. In all of those instances, one of the things that made it reasonable was that there was notice. I was talking about more the greater concept of what's going on in these kind of searches. That's what I was referring to. Thank you very much for your time, Your Honor. Your Honors, I'll just address very briefly three points mentioned by my Mr. Murnell. One of them was that the considerations were for security. Then why take child protective services? If security was a concern, why was child protective services? That is one of the defendants. She doesn't claim she was there to be helpful. And then the other question was about the forcible entry, a no-knock. A no-knock warrant is typically a criminal warrant, Your Honor. This wasn't a no-knock warrant. It doesn't say no-knock warrant. It wasn't a no-knock warrant. Forcible entry. And the warrant said that if somebody wasn't there, they could go in. Correct, Your Honor. And there is testimony by Brown, testimony and the depositions by Brown, that he entered an apartment where there were no tenants. So it wasn't no-knock, but if nobody came to the door, they could go in. Correct. Okay. But I'm saying that the forcible entry is the same as no-knock because it's somebody. No, it's not. No-knock means you don't have to knock first. That's what the Supreme Court says. Understood, Your Honor. Yes. And then the other issue raised by Mr. Marnell was that. Is there a fact, I'm still looking for this Ninth Circuit case that supposedly says it's okay to have a no-notice administrative warrant. Is there such a case? I'm sorry, Your Honor. I was told that there was a Ninth Circuit case saying that it's okay to have a no-notice administrative warrant. Is there such a case? Only. But that there's qualified immunity, I think was the. Only after consent has been refused. Only after many safeguards have been, have taken place. If consent has been refused, then we argue that it would have to have been refused by each tenant in each apartment. Which is the case? I believe it was, it was Camera that stated that it's, that it seems likely that warrants are normally. Camera is a Supreme Court case. Yes, correct, Your Honor. It's not a Ninth Circuit case. So there is no, you're right, Your Honor, there is no Ninth Circuit specifically on point. I believe I'm out of time, Your Honors. Thank you very much. Okay, thank you very much. Thank both of you for your argument in Newberry v. County of San Bernardino. We'll go to the last case of the day, Western World Insurance v. Professional Collection.
judges: Tashima, Berzon, Kennelly